## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No. 1:20-mj-00013 (DAR)** |
| **OMAR AL-KAHTANY,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The United States respectfully submits this Memorandum in support of its motion for pretrial detention pursuant to 18 U.S. C. § 3142(f)(2)(A).

## BACKGROUND

On January 19, 2020, at approximately 7:03 a.m. United States Secret Service ("USSS") Officer Matthew Dapello was on-duty on a foot beat in the 1600 block of E Street, NW when he heard a voice screaming incoherently. Officer Dapello observed an adult male, later identified as the defendant, Omar AL-Kahtany, in a dark jacket and pants without shoes walking toward the employee gate to the White House grounds, and screaming. The gate the defendant was walking towards has an attached sign, "Restricted Area, Do Not Enter." The gate is located in the middle of a set of jersey wall barriers that are topped with metal fencing and which separate the Ellipse, an area open to the public, from E Street, NW, which is part of the restricted area around the White House and its grounds.

The defendant approached Officer Dapello and screamed at him, "Are you one of them?" He further yelled at Officer Dapello to "open the gate." Officer Dapello told the defendant that he would not open the gate. The defendant then climbed up the jersey security barrier and crossed the fence line while standing barefoot on the barrier. Officer Dapello and Officer Logan

Colwell approached the defendant and told him to get down from the barrier.  The defendant refused and repeatedly made kicking motions towards Officer Dapello and Officer Colwell. Officers Dapello and Colwell then pulled the defendant from the barrier, who landed on his feet. The defendant attempted to pull away from the officers, and began to flail his legs to thwart the arrest.  The officers were eventually able to subdue him on the ground.  As the officers placed the defendant into handcuffs on the ground the defendant began yelling repeatedly, "Allahu Akbar!", which is Arabic for "God is Great!"  The defendant continued yelling while sitting on the ground for several minutes.

USSS officers who were not involved in the initial encounter, but heard the defendant yell, called for translation assistance.  Officer Stephan Lucas arrived to provide translation assistance and bent down to speak with the defendant, who was still on the ground.  As Officer Lucas began speaking with the defendant in Arabic, the defendant responded by spitting at Officer Lucas.  Officer Lucas attempted to avoid the spit, but it landed on his hand.

As a result of this incident, the White House security level was elevated temporarily; however, no protectee movements were affected by the incident.

Further investigation revealed that at approximately 6:50 A.M., a witness observed a car, later identified as the defendant's car, a Honda Accord with Florida tags, travel at between 80 and 90 mph in the north bound direction of 14th Street, N.W.  The witness then observed the vehicle hit a parked car in the 200 block of 14th Street, N.W., causing significant damage to both cars.  The accident location is approximately 3 blocks from the arrest location.

The defendant was later taken to Sibley Memorial Hospital.  At the hospital, the defendant made spontaneous statements to USSS Officers Sweiderk and Miller that he was being chased, and that he was trying to get away when he got into a car accident.  The defendant also

repeated a mantra in Arabic and would get angry and upset.  At one point, the defendant tried to break free of his handcuffs while restrained to the chair at the hospital.  The defendant further refused officers' commands to remain seated, and he would stand up and act aggressively toward the officers.

While at Sibley Memorial Hospital, Special Agent Fabac and Officer Reyes, two members of the USSS Washington Field Office's protective intelligence team attempted to interview the defendant.  SA Fabac and Officer Reyes noted that the defendant was not dressed appropriately for the weather, wearing only a white, short sleeve shirt, white long pants, and no shoes.  The defendant was also wearing a spit mask covered in his own spit.  SA Fabac and Officer Reyes were advised that the defendant had been very agitated and exhibiting very aggressive behavior prior to their arrival, and that the defendant had been spitting at officers on the scene while he was being apprehended.  After the hospital processed the defendant, he was admitted temporarily and was cleaned and changed into a hospital gown by hospital staff.

Once the defendant was cleaned and changed, SA Fabac and Officer Reyes entered the defendant's room, showed their credentials, and identified themselves as law enforcement with the USSS.  The defendant was read the Miranda Warnings.  The defendant shook his head yes in acknowledgement that he understood his rights.  The defendant then invoked his right to remain silent with an additional head shake of no when asked if he was willing to waive his rights.

During transport to the 2nd Police District after treatment at the hospital, the defendant stated that the officers should know who he is if they didn't already, and that war was coming from the Middle East, so the officers needed to watch out.  During booking and further processing, and in response to officer's booking questions about his address, the defendant provided several different addresses in the state of Virginia.  While awaiting processing, the

defendant made additional spontaneous statements to Officer Dapello.  The defendant repeated the following multiple times: "I just want peace," and "If you accept my conditions I will not destroy you."  The defendant also told Officer Dapello that he had spent time in Saudi Arabia. Further records check confirmed the defendant had recently returned from a foreign trip to Saudi Arabia.

The defendant was also brought the Comprehensive Psychiatric Emergency Program (CPEP) run by the D.C. Department of Behavioral Health on January 19, 2020 because the defendant kept banging his head against the walls.  CPEP provided the defendant with medication, but did not accept him, so he was transported to jail.

Upon further investigation, it was learned that the defendant resides in Alexandria, Virginia, and that the day before the incident, his roommate filed a missing person's report with the Alexandria Police Department.  In it, his roommate stated that the defendants has "hasn't been acting normal" for the past three days and has been walking around the apartment yelling about the impeachment of President Trump and an unknown warning coming from DC.  The roommate also advised the defendant thinks the police are watching him and he is constantly checking all the windows as if he were being watched.  The roommate further advised that early that morning, January 19, 2020, the defendant began yelling about President Trump and took his car keys and left.  The police report notes that around that time, units were dispatched for a male screaming, but were unable to locate him.  The roommate advised that he had repeatedly tried calling the defendant, but all calls went to voicemail.  The roommate also advised that he did not know where the defendant would go, because the defendant does not know anyone in the area. The roommate was not aware of it the defendant took any medications.

On January 20, 2020, the roommate agreed to be interviewed by law enforcement about the defendant.  The roommate indicated that the defendant appears to be a completely different person now than he was a couple of years ago, indicating that he had been growing more depressed, nervous, and showing signs of paranoia.  The roommate reported that on multiple occasions, the defendant has been reported to be screaming outside on the balcony, talking to himself, and walking in circles in the living room.  The roommate also advised that prior to leaving their apartment that morning, the defendant had not slept for two days, showed signs of anger issues, and was sending "weird" text messages to his friends and family.  When asked to elaborate, the roommate advised the he and the defendant had gotten into a physical altercation few days prior regarding a nonsensical issue.  As to the text messages, the roommate was not sure what about the messages themselves, only that whatever was in them was causing the defendant's friends and family to ask him what had happened to the defendant, as the defendant was not acting normally and they were concerned.

The roommate also advised that before leaving the apartment on the morning of January 19, 2020, the defendant had opened the balcony doors and began yelling "Allah" on repeat and continued saying there was a "warning in DC" and that [the roommate] "have to be patient." Continuing to scream, the defendant then took the keys to his vehicle and left the residence. When advised of the events at the White House on January 19, the roommate appeared shocked and stated he was willing to continue the interview to answer additional questions.

When asked about the defendant's family, the roommate stated that all family members live in Saudi Arabia[1] and that he believed the defendant's mother and brother will be arriving in the United States next Saturday, January 25, 2020.  He further advised that the defendant's

---

[1] The defendant is a dual citizen of the United States and the Kingdom of Saudi Arabia and believed to have passports issued by both countries.

family members decided they may need to come to the United States to help with the defendant, as they believe he is depressed, very sick, and may require assistance.   When questioned about the defendant's mental health and medication use, the roommate stated he has no knowledge of any medications that the defendant may be taking and that he doesn't believe the defendant has seen a mental health professional or any doctor in the DC/DMV area.  The roommate had a vague recollection of the defendant perhaps seeing a doctor while a student in Florida.

During the investigation of the incident, the USSS was also contacted by an attorney from the Embassy of Saudi Arabia about the defendant.  The Embassy attorney advised that he was in contact with the defendant's family in Saudi Arabia and wanted to ensure that the USSS knew that the family said the defendant is mentally ill and in need of a mental health evaluation. In a subsequent exchange with the undersigned prosecutor, the Embassy attorney reiterated the family's concern and indicated that the family believed the defendant to be "mentally unstable".

The defendant was not medically cleared to appear in District Court for his first two scheduled appearances.  According to medical personnel at the D.C. Jail, the defendant was seen at Intake on January 20, 2020 and was sent to Howard University Hospital for an eye injury. While at the hospital, he had what the doctor terms a "psychotic break" and was returned to the jail to await an evaluation and treatment by a psychiatrist.  Reports from law enforcement indicated that at least until his initial appearance on January 23, 2020, he was continuing to be combative, was failing to follow police instructions, was attempting to get out of his handcuffs, was trying to spit at people, yelling.

## **ARGUMENT**

As the defendant's competency is currently in question, the Court should defer ruling on the government's request for detention until after a competency evaluation, a competency hearing,

and any necessary period of competency treatment.[2]  "[I]f there is reasonable cause to believe that a defendant has a mental disease rendering hi/m unable to understand the nature and consequences of the proceedings and against him and/or to assist in his defense, it makes sense that the preliminary hearing and detention hearing be deferred until such time as the defendant has been determined to be mentally competent." *United States v. Moser*, 541 F. Supp. 2d 1235, 1237 (W.D. Okla. 2008).  *But see*, "[T]he need for scrutinizing a defendant's understanding of the proceedings at initial phases appears to be somewhat lesser than during trial." *United States v. Crawford*, 738 F. Supp. 564, 565 (D.D.C. 1990).  Where there are concerns about a defendant's competency to understand the proceedings, it is also difficult to assess in any meaningful way the defendant's risk of flight.

The Bail Reform Act lists four factors that guide a court's detention decision: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  *See* 18 U.S.C. §3142(g).  In considering the defendant's history and characteristics, the Bail Reform Act specifically instructs courts to consider a defendant's "mental condition."  *Id.* at § 3142(g)(3)(A).  The D.C. Circuit has also recognized that a court may take into account a defendant's mental health when deciding whether the defendant should be detained pending trial or released on conditions.  *See United States v. Weissberger*, 951 F.2d 392, 399 (D.C. Cir. 1991).

---

[2] At the initial appearance on January 23, 2020, the Government requested a competency hearing pursuant to 18 U.S.C. § 4241(a) and a competency screening pursuant to 18 U.S.C. §§ 4241(b).  The Court ordered a twenty-four evaluation, which is currently scheduled for January 28, 2020.

At a detention hearing, the government may present evidence by way of a proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996). A judicial determination that a defendant should be detained pending trial as a serious risk of flight need only be supported by a preponderance of the evidence. *United States v. Vortis*, 785 F.2d 327, 328 (D.C. Cir. 1986).

If the Court is inclined to rule on detention at the hearing on January 28, 2020, the Court should find that, by a preponderance of the evidence, no condition or combination of conditions would reasonably assure the defendant's appearance at this time.

## **Factual Proffer**

The defendant is charged with entering and remaining in, and attempting to enter and remain in, a restricted area, that is, the secured area around the White House. He is also charged with two counts of forcibly assaulting, resisting, opposing, impeding, intimidating, and interfering with law enforcement officer engaged in and on account of the performance of their official duties. The Government's evidence that he committed these crimes is strong. Defendant was witnessed climbing on security barrier and crossing over the fence on top of it into the restricted area by two USSS law enforcement officers working in the area that morning.[3] The defendant was also seen refusing to climb down off the barrier and making repeated kicking motions towards the law enforcement officers, at which time, they had to physically pull him off the barrier. As the defendant landed on his feet, he then tried to pull away from the officers and began to flail his legs to thwart arrest. Law enforcement also witnessed the defendant spitting on another USSS officer who arrived on scene to provide translation assistance.

---

[3] Given the surveillance set-up of the White House and its surrounding areas, there is also likely video of the incident; however, at the time of the filing of this Memorandum, the undersigned prosecutor has not yet been affirmatively advised that the incident was caught on any of the cameras.

USSS was also able to determine that the incident took place shortly after the defendant got into a motor vehicle accident.  A witness reported seeing the defendant's vehicle traveling at a high rate of speed (i.e., between 80 and 90 miles per hour) on northbound 14th Street, NW, where it crashed into a parked car and caused significant damage to both vehicles.  The accident location was approximately three blocks away from where there defendant was arrested.  After his arrest, the defendant informed the USSS officers with him at the hospital that he was being chased and he was trying to get away when he got into a car accident.

Throughout the incident, the defendant's behavior demonstrated an inability and/or unwillingness to follow the rules or obey lawful orders.  During the initial encounter, the defendant ignored the sign on the gate that said "Restricted Area, Do Not Enter", climbed up on the security barrier and crossed the fence, and refused to follow officers' instructions to get off the fence.  The defendant also did not remain at the scene of the accident or report it to the authorities.  Since his arrest, he has repeated failed to follow simple commands issued by law enforcement personnel and attempted to get out of his handcuffs.

As related to his history and characteristics, the defendant is a nearly twenty-six year old male who is a student at Georgetown Law.  Based on his behavior and information from his friends and family, as well as from DC Jail medical staff, the defendant also appears to be in the midst of a mental health crisis, possibly suffering from a psychotic break.  By all accounts, his behavior of late is markedly different than his normal behavior, raising concern amongst his family and friends. He appears unable to regulate his behavior appropriately, raising significant concerns that he would be unable to follow any orders of the Court should he be released in this case, including an order to appear at the next Court proceeding.  While he does live in the area, he lives with just a roommate, an individual who has no ability to (or to the Government's knowledge, a demonstrated

willingness to) take responsibility for the defendant.  The defendant's family lives in Saudi Arabia and is only present temporarily to assist in getting the defendant mental health assistance, and therefore not seemingly able to take custody and ensure his continued presence throughout the pendency of the case.  Nor is there any indication that they wished to do so, even if able.

Most importantly though, the defendant's mental health renders him unreliable and unlikely to adhere to court orders.  His recent behaviors and statement, as detailed by his roommate and law enforcement personnel, demonstrate that the defendant is acting irrationally and illogically.  As to his mental state, the defendant's roommate has indicated that he is acting very unusual for him and his family has indicated that he is suffering from a mental health issue and in need of assistance.  Furthermore, medical personnel who have examined him have indicated that he appears to have experienced a "psychotic break".  Taken altogether, these facts suggest a defendant who is not himself, but suffering an acute mental health crisis, acting illogically and out of character, and not in control of his own mind.

As to the risk the defendant's release would pose to the safety of others or the community, while the defendant has not to the Government's knowledge ever been violent,[4] the defendant has been consistently acting combatively since his arrest and not always following lawful instructions and commands, giving rise to concern about how he would act if released.  Given that the defendant is also apparently seeing things and/or having paranoid delusions (e.g., thinking the police were watching him prior to the incident and getting into a car accident because he thought he was being chased), there is strong likelihood that he such delusions would lead to him to engage in other such irrational acts, some of which could potentially dangerous.

---

[4] The defendant was previously arrested for trespass after warning, disorderly intoxication, and resisting officer without violence to his person in October 2018.  All three charges, however, were nolle prosequied.

The Government also notes that the results of the screening evaluation ordered by the Court may provide additional information about the defendant's mental health and any risk he may pose if released, and the Court should therefore wait for the screening results before making its detention decision.

## Conclusion

For the foregoing reasons, the government requests that the Court order that the defendant be detained pending trial as a serious risk of flight pursuant to 18 U.S.C. § 3142(f)(2)(A).

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845

By:      /s/
REAGAN N. CLYNE
Special Assistant United States Attorney
Virginia Bar No. 74767
United States Attorney's Office
National Security Section
555 Fourth Street, N.W.
Washington, DC  20530
Reagan.Clyne@usdoj.gov
(202) 252-7215